327 P.2d 262

**Ruth Ethel Drury MARSHALL, Plaintiff and Respondent,**

**Fern Drury Tayler, Plaintiff in Intervention and Respondent,**

v.

**George T. TAYLER, Defendant and Appellant.**

No. 8792.

Supreme Court of Utah.

July 7, 1958.

30

Hanson, Baldwin & Allen, Walter L. Budge, Salt Lake City, for appellant.

Romney & Nelson, Donn E. Cassity, Jack L. Crellin, Salt Lake City, for respondents.

WORTHEN, Justice.

Ruth Ethel Drury Marshall brought an action against defendant to recover for personal injuries. Fern Drury Tayler, wife of defendant, intervened seeking damages for personal injuries sustained by her from the same tortious act of defendant.

From adverse verdicts in the court below defendant appeals.

We will refer herein to five principal persons: (1) the defendant's wife, Fern Drury Tayler; (2) the wife's sister, Ruth Drury Marshall; (3) the husband of the wife's sister, Leland Monty Marshall; (4) the wife's mother, Ethel G. Drury; and (5) the defendant, George T. Tayler. These persons will be referred to sometimes herein as the wife, sister, brother-in-law, mother and defendant. The following facts are not in dispute.

Defendant and Fern Drury Tayler were married at Gallup, New Mexico, March 2, 1951. Defendant and his wife were first cousins. They never established a home, but they lived together as man and wife for five years. The wife lived at the home of her folks while defendant occupied a hotel room where the wife visited defendant. She declined to live with him in an apartment. The wife testified that they carried on a normal husband and wife relationship and that she visited with him almost nightly during this five year period. The wife testified that she had never had an altercation with defendant and that she knew he always evaded anything unpleasant.

At a family gathering in August, 1956, at the Marshall home, there was an alter-

cation and certain remarks made by defendant who was chastised by the sister and the mother. Thereupon the defendant "opened the door and walked out." The record is clear that defendant had a reputation for avoiding unpleasantness.

Sometime after defendant walked out on his wife's family he moved to Grand County to establish residence and obtain a divorce.

The wife testified that she saw the defendant after he filed the suit for divorce and that he said:

"Fern, I have gone down to Thompson to get a divorce. I will send you the papers."

Mrs. Tayler further testified as follows:

"Q. That is the last time you saw him? A. No, I did not want a divorce. I pleaded with him not to get it. I went back again the next night and pleaded with him not to get a divorce.

"Q. Did you see him the next night? A. I went back several nights.

"Q. How long had it been since you had seen him in Salt Lake City, until you saw him down in Thompson? A. Just a couple of days. I did not want the divorce."

Notwithstanding Mrs. Tayler had spent much time in attempting to talk her husband out of going on with the divorce action, with no success; she, the sister, the mother and the brother-in-law left Salt Lake City in the late evening of September 11 in quest of defendant. They arrived at Thompson, Utah, about midnight. The husband's car was parked at a motel there. The wife and her party registered and entered the unit next to defendant. The wife testified that defendant did not know they were coming.

Mr. Marshall testified that shortly after they arrived at Thompson he and Mrs. Tayler went to the door of defendant's room and asked admittance; that the wife pleaded with him to talk with her. He testified that he requested defendant to open the screen door, which was locked, and let them in so they could talk with him. The testimony is in conflict as to how long the wife and her brother-in-law were at defendant's door seeking to get him to talk with them. Mrs. Tayler estimated the time as five minutes or a little more; the defendant testified that they called and hammered on the door for 30 minutes. Defendant's room was dark, and he did not answer their request that he talk to them or let them in. Mr. Marshall testified that they knew defendant did not want to come to the door and did not want to talk with them. When asked why they didn't wait 'til morning before trying to talk with defendant, Mr. Marshall testified that they were afraid "he would get up and take off before them."

The wife testified that after she and Mr. Marshall left defendant's cabin door, Mr. Marshall went to his station wagon and the three ladies took off their dresses and lay down; she didn't think she slept. She said she heard a door slam and stated, "I knew my husband was doing the usual thing running out."

Mrs. Tayler testified that she ran to the door of the motel and saw her husband getting in his car. She ran out in her bare feet and to the left side of his car; as she ran she called for "Monty." She put her hand on the left door handle and pleaded with defendant to talk with her. The car door was locked and the window was up. At the same time the sister ran to the right side of the car and took hold of the door handle on that side. Both plaintiffs testified that they spoke to defendant but that he did not answer them. Defendant testified that he asked both women to get off the car.

Mrs. Tayler testified that all of a sudden the car gave a sudden jerk and started moving at the same time.

Plaintiffs and Mr. Marshall testified that defendant started the car and backed up about two car lengths, zigzagging as he moved in reverse. The plaintiffs testified that they could not let go of the car. Defendant then shifted gear and went forward and through the service station and onto the highway. As the car passed through the service station one of the ladies came in contact with a soft drink vending machine and the other with a gas pump. The plaintiffs described the defendant's movement as sudden and zigzagging. Both testified that there was no opportunity for them to let go of the car door handle.

Mrs. Tayler testified:

"I had hold of the handle, and it swept me off my feet. Before I could get my bearings, he went back and forth, he weaved, I could not let go, I would have been run over. * * * Yes, it all happened so fast, like I said, he started with a jerk, and weaved to the side, I lost my balance, and then he weaved to the other side, he backed up, *at no time did he stop to my recollection, he never stopped. He came forward weaving back and forth.* I could not let go, I would have gone under one of the wheels if I had of. All of a sudden, I hit an object." (Emphasis added.)

However, Mr. Marshall, plaintiffs' witness, testified that the speed of Tayler's car "as he backed the two car lengths did not exceed 15 miles * * * I know he could not possible have gone over 15 miles. * * *" Marshall testified that the maximum speed of the forward movement to where Tayler entered the canopy of the service station was about 15 to 20 miles

per hour. Mr. Marshall admitted that the car backed up and *stopped* before going forward. Mr. Marshall didn't deny that the ladies could have let go of the door handles when the car stopped before going forward.

It cannot be questioned that plaintiffs could have let go of the door handles when the car stopped after defendant backed up. The failure of the wife and the sister to leave the car cannot be reconciled with the observance by plaintiffs of due care for their own protection.

The wife was determined at all hazards to prevent defendant from getting a divorce and was willing to go to any length to insist on forcing defendant to listen to her; in fact, her conduct was completely unwarranted and beyond all bounds of reason. She testified that the reason they lay down without fully undressing was so she could get out and prevent her husband from going if he tried to get away from her. She testified that as she ran out of the motel calling for "Monty" she was *"excited* and *emotionally upset."* When asked if she knew how many times she called for Monty, she answered, "No. I know I called 'Monty' as I went out of the door. *I was desperate*; I wanted *to talk to him so bad."* (Emphasis added.)

The wife and the sister, lying in wait for defendant to make a move, certainly demonstrated their desperation and their lack of judgment as they flew out the door without shoes or stockings, with no dresses, but only underwear and petticoats. Ichabod Crane, as he fled through the night, pursued by the headless horseman, presented as moderate a spectacle as plaintiffs running half clad across the motel court. They hurled themselves, running over the gravel, toward defendant's car, with no concern for their safety, bent only on forcing defendant to submit to their desire for conversation.

We are forced to the conclusion that the plaintiffs were negligent, and that they, in placing themselves in a position of peril, assumed the risk of injury. Plaintiffs' own witness testified that the car stopped after having gone backwards. It is patent that they could have removed themselves from any danger had they let go of the handles before the car started to move forward. They testified that they were unable to let go as the car backed. They were then charged with the duty of getting away from the car before it started to move again. They cannot blame anyone but themselves for the injuries they sustained as the car moved through the service station. Their reckless zeal in attempting to force defendant against his will to talk with them is the cause of their injuries.

Plaintiffs' actions indicated that they had no idea of looking out for their own safety

—they relied entirely on defendant to see that no harm came to them regardless.

The jury's verdict negatives any question of wilfulness or wantonness on the part of the defendant, and we think there can be no argument with the jury's finding. Defendant's testimony, which is a statement of his mental attitude, is consistent with the jury's special verdict that the actions of defendant were not activated by malice. He said:

"I never had a thought in the world Mrs. Tayler and Mrs. Marshall was going to hang on the car, never a dream came to me. If I ever thought that, I would have found other ways to get away. I thought Mrs. Tayler and Mrs. Marshall had enough sense —all you need is common sense—to know that you could not hold that car back, * * *."

Counsel for the respective parties have raised and argued the question as to whether or not a wife has a cause of action against her husband for a nonintentional injury inflicted by her husband during coverture.

Having concluded that plaintiffs were contributorily negligent and that they assumed the risk of injury, we deem it unnecessary to discuss the question of a wife's right to sue under the facts here present, nor to comment on the uncertainty of that question as demonstrated by the several opinions in the case of Taylor v. Patten.[1]

Judgment is reversed and the case is remanded with directions to enter judgment for defendant. Costs to defendant.

McDONOUGH, C. J., and CROCKETT and WADE, JJ., concur.

HENRIOD, Justice.

I concur outright with the main opinion in the case of the plaintiff Marshall, but as to the plaintiff Tayler, I concur in the result, not on the grounds stated in the main opinion, but on the grounds that there is no authority for the proposition that a wife may sue her husband in tort in this state. In Taylor v. Patten, cited in the main opinion, two Justices concluded there was such a cause of action that a wife might pursue, two Justices concluded there was not such a cause of action, and one Justice concluded that there was such a cause of action, provided the assault and battery was committed after the interlocutory decree had terminated certain domestic privileges. I think the case of Peters v. Peters, 42 Iowa 182, should be controlling here as to the plaintiff Tayler, since that case interpreted an Iowa statute identical to our own and from which we took our

1. 2 Utah 2d 404, 275 P.2d 696.

own statute. In accordance with established principles of statutory construction, we would take it as it was construed by the highest court of the state from whence it came, except in rare and unusual cases.

I assume that the language of the main opinion that "having concluded that plaintiffs were contributorily negligent and that they assumed the risk of injury, we deem it unnecessary to discuss the question of a wife's right to sue under the facts here present, nor to comment on the uncertainty of that question as demonstrated by the several opinions in the case of Taylor v. Patten," in no way is intended to reaffirm or actually extend the decision in that case, but only to ignore it. I make this assumption since, technically speaking, if this case is decided on the ground that Mrs. Tayler was contributorily negligent, there is a possible suggestion that if she had not been contributorily negligent she otherwise would have had a cause of action against her husband, and that if she had such a cause of action against him, it would lie, even though the circumstances giving rise thereto did not arise during the interlocutory period, but arose as here, even before any divorce was granted. If the main opinion intended by such language to arrive at any such conclusion, I would dissent.